USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-30-2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARL AMATO,

Plaintiff,

- against -

EDMUND HARTNETT, JOHN BENNETT, CHARLES FARA, ROBERT SAWCHUK, ED LEAHY, ANTHONY ZIPPO, and THE CITY OF YONKERS,

Defendants.

**OPINION AND ORDER**

09-cv-9511 (ER)

Ramos, D.J.:

Plaintiff Carl Amato ("Plaintiff" or "Amato"), a former Detention Officer for the City of Yonkers (the "City"), brings this civil rights action pursuant to 42 U.S.C. § 1983 against the City and various employees of the City Police Department and the City Courts and Detention Services Division (collectively, the "Defendants"), alleging violations of Plaintiff's First, Second, Fourth, Fifth, and Sixth Amendment rights, as well as conspiracy to deprive Plaintiff of his constitutional rights, and a state law claim for conversion for Defendants' continued possession of Plaintiff's firearms. Defendants move for summary judgment on all of Plaintiff's claims pursuant to Fed. R. Civ. P. 56.[1] Doc. 34. In his opposition papers, however, Plaintiff voluntarily dismissed his Sixth Amendment claim, as well as his § 1983 claims against the City. Pls.' Mem. L. 12-13.

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

[1] Although Defendants' motion indicates that they move for summary judgment on all causes of action alleged in the Complaint, Doc. 34, Defendants failed to make *any* arguments regarding Plaintiff's Second Amendment claim (Fourth Cause of Action) in their moving papers. Accordingly, Defendants' motion for summary judgment on Plaintiff's Second Amendment claim is denied.

## I. Factual Background

The following facts are undisputed except where otherwise noted.

Plaintiff Amato served as a Detention Officer for the City from 1988 until his dismissal in 2007. Defs.' 56.1 Stmt. ¶ 1.[2] On or about April 19, 2006, City Detention Officer Moray ("Moray"), Amato's long-time partner, shot his wife and killed himself. *Id.* ¶ 9. Amato alleges that he warned Defendant Bennett ("Bennett"), the Detention Services Supervisor, of statements made by Moray prior to his suicide wherein Moray allegedly expressed his intent to kill his wife and himself. *Id.* ¶¶ 3, 10. Bennett disputes that any such conversation ever took place. *Id.* ¶ 11.

In the days subsequent to Moray's death, Amato was questioned by the Westchester County Police. Affirmation of Thomas Cascione ("Cascione Aff.") Ex. 1 ¶ 7; Affirmation of Darius Chafizadeh ("Chaf. Aff.") Ex. EE, at 18. According to a Westchester County Police Department report, in response to the questioning, "Amato stated that [] Moray did not indicate to him that he would try to kill his wife or himself." Chaf. Aff. Ex. EE, at 18. Amato, on the other hand, claims that during the police department's questioning, he was asked whether he knew that Moray "was going to do something *that day*," to which he responded "no." Cascione Aff. Ex. 1 (Amato Aff.) ¶ 7 (emphasis added). According to Amato, as of the time of the questioning, Bennett had already "made it clear that he did not want anything coming out which would embarrass the Yonkers Police Department." *Id.* He also believed his answer was "[t]echnically" accurate since "it had been weeks since [Moray] expressed anything unusual to [him]." *Id.*

---

[2] Citations to "Defs.' 56.1 Stmt." refer to Defendants' Local Civil Rule 56.1 Statement, Doc. 36.

**a. Amato's December 2006 Hospitalization**

On December 5, 2006, Defendant Zippo ("Zippo"), a City Detention Officer, was walking through the lunch room of the Yonkers City Courthouse when he overheard Amato mumble something that he thought was to the effect of, "maybe I should do what he did." Chaf. Aff. Ex. I at 14-15. Zippo took Amato's statement as a reference to Moray's death because following Moray's death, Amato had been "walking around very sad and depressing looking for a long period of time." *Id.* at 16. Zippo then questioned Amato and asked him if he was "talking about hurting [him]self," at which time, Amato gestured no and "put his head down and mumbled something." *Id.*; Chaf. Aff. Ex. K at 1. According to Amato, however, he did not make any statement about wanting to kill himself at that time, but rather, "was grousing about [his] bad lunch and declaring that [he'd] be happy to get off that job and retire since pretty much everything had been lousy there since [Moray] died." Cascione Aff. Ex. 1 ¶ 9. Amato claims that in response to Zippo's inquiry about whether Amato wanted to hurt himself, he "kind of chuckled and kept eating and was just totally disgusted at being in [Zippo's] presence and walked out." Chaf. Aff. Ex. C at 51. Prior to the incident, Amato and Zippo had had some "friction" and "were not the least friendly." Chaf. Aff. Ex. E at 26, Ex. I at 18; Cascione Aff., Ex. 1 ¶ 9.

Detention Officers Ferrara and Wanderman, who were sitting with Amato eating lunch at the time of the incident, did not hear Amato threaten to harm himself. Chaf. Aff. Ex. C at 50-51; Ex. K at 3. According to a December 11, 2006 Supplementary Report filed by Bennett, however, Ferrara and Wanderman "both expressed similar concern about D.O. Amato due to his current demeanor." Chaf. Aff. Ex. K at 3.

Several days later, on December 8, 2006, Amato unlocked the gate to the jail, but did not

let Zippo through, leaving Zippo to open the gate himself, despite the fact that Zippo had his arms full at the time. Chaf. Aff. Ex. E at 26-27. Zippo took Amato's action as a "discourtesy," was "aggravated" about it, and "had a little exchange of words" with Amato. Chaf. Aff. Ex. E at 27; Ex. I at 18-19. Zippo then went to Bennett's office to bring him his breakfast, and told Bennett that he and Amato had just had another incident. Chaf. Aff. Ex. I at 18. Zippo complained about Amato, and told Bennett that he was a "sad sack and didn't want to do anything and pretty much didn't do anything." Chaf. Aff. Ex. E at 27-28; Ex. I at 19. During the course of that conversation, the fact that Amato had taken "a ton of [sick] time off" came up, and Bennett commented that he hoped Amato didn't "do anything stupid." Chaf. Aff. Ex. E at 28; Ex. I at 19. According to Bennett, in the months following Moray's death, he had observed Amato as "seem[ing] depressed," and not acting as "himself." Chaf. Aff. Ex. E at 24. Zippo then told Bennett about the conversation that he had had with Amato in the lunch room of the Yonkers City Courthouse, and told Bennett that he heard Amato say in passing, "Maybe I should do what he did." *Id.* at 28.

Bennett immediately reported his conversation with Zippo to Defendant Fara ("Fara"), Commanding Officer of the Detention Division, and the two had a discussion about what to do about the situation with Amato. Chaf. Aff. Ex. E at 29-30. Fara and Bennett then called Amato into Fara's office, and, according to Fara, Amato related that "he was depressed over work situations and situations at home." Chaf. Aff. Ex. C at 53; Ex. F at 15. According to Amato, however, Fara and Bennett confronted him during that meeting with a report that he made statements to the effect that he "wanted to take [his] gun out of [his] holster and put it in [his] mouth and blow the back of [his] head out." Chaf. Aff. Ex. C at 53; Cascione Aff. Ex. 1 ¶ 11. Amato denied making any such statement, begged them to speak to the other officers who were

present for the conversation, and stated that he couldn't "wait to get off this job." *Id.*; *see also* Cascione Aff. Ex. E at 34 (Bennett testimony that Amato told Fara and Bennett that he did not make any statement about wanting to hurt himself to Zippo); Ex. R at 2.

Bennett and Fara decided that they "weren't qualified to make any decisions, [and] that [Amato] should speak to a professional." Chaf. Aff. Ex. E at 33. They based this decision on their impression that Amato "seemed more visibly depressed around that time than he had"; that his sister's marital problems and the fact that the holidays were coming appeared to be bothering him; and in light of the fact that "Moray's death [was] fresh on everybody's mind." *Id.* At that time, Amato was taken to St. John's Hospital ("St. John's"), where he was admitted on an "emergency" basis on December 8, 2006. Chaf. Aff. Ex. C at 54; Ex. L at 33-35. Although Bennett and Fara testified that Amato voluntarily agreed to go to the hospital, Amato claims that he refused, but was ultimately forced to go to St. John's by Fara and Bennett. *Compare* Chaf Aff. Ex. E at 36; Ex. F at 21 *with* Chaf. Aff. Ex. C at 54, 144; Cascione Aff. Ex. 1 ¶ 11.

At St. John's, Amato met with: (i) Mo Bubbicco of the Yonkers Employee Assistance Program ("EAP"); (ii) Lou Picani of the Teamsters Union, Local 456; and (iii) Dr. Chiriugi. Defs.' 56.1 Stmt. ¶ 37. Dr. Chiriugi indicated that he did not perform mental evaluations, and that they would have to take Amato to St. Joseph's Hospital ("St. Joseph's"). Chaf. Aff. Ex. E at 36; Ex J at 3. Amato was then transported to St. Joseph's, where he was met by his sister, Diane Jichetta, and examined by Jelena Veselinovic, M.D., a psychiatrist. Defs.' 56.1 Stmt. ¶¶ 39-41. Dr. Veselinovic's report indicates that she spoke to Amato's "immediate supervisor, union representative, [and] captain, who <u>all</u> reported that [Amato] was observed being depressed for [the] last 5 months." Chaf. Aff. Ex. M (emphasis in original); Ex. L at 14. The report also states that Amato "currently denies suicidal, homicidal ideations." Chaf. Aff. Ex. M; Ex. L at 19.

Following her examination of Amato, as well as discussions with his co-workers and union representative, Dr. Veselinovic executed a "Certificate of Examination by Director of Community Services or Designee," pursuant to Section 9.37 of the New York Mental Hygiene Law, specifically finding that:

> It is my opinion that this person's mental illness is likely to result in serious harm to himself or herself or other. By likely to result in serious harm, I mean: substantial risk of physical harm to the person manifested by threats of or attempt at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself . . . and/or substantial risk of physical harm to other persons, as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

Defs.' 56.1 Stmt. ¶ 43.

**b. The Seizure of Amato's Guns**

Fara testified that Dr. Veselinovic told him directly that Amato's guns should be taken for safekeeping.[3] Chaf. Aff. Ex. F at 23; Ex. R at 2. Defendant Sawchuck ("Sawchuk") and non-party McAuley ("McAuley") of the City Police Department spoke to Amato while he was in the hospital regarding the safekeeping of his guns. Chaf. Aff. Ex. G at 8; Ex. O at 1. The parties dispute whether Amato consented to allow Sawchuk and McAuley to enter his home and collect his firearms for safekeeping. Sawchuk testified that Amato was "originally hesitant," but that he ultimately agreed to allow them to take his guns after they explained to him that it was for his "own personal safety and well-being," and that it "would be in [his] best interest." Chaf. Aff. Ex. G at 8; *see also* Ex. O at 1; Ex. R at 2. Amato, on the other hand, testified that he gave Sawchuk the approval to take his guns out of his house, but only after they told him they were

[3] Amato disputes that Dr. Veselinovic instructed Fara that Amato's guns should be taken, as her report states, "[w]eapon in the possession of Yonkers PD supervisor," thereby "imply[ing] that she was under the impression that Amato's guns were already taken." Pl.'s 56.1 Stmt. ¶ 45.

"going in and getting [his] guns, one way or the other," and that if he did not let them in, they were "going to get a warrant and [were] going to go in [his] house." Chaf. Aff. Ex. C at 150-51.

After ultimately obtaining Amato's permission to enter his home, Sawchuk and McAuley met Amato's brother-in-law, Joseph Jachetti, at Amato's home, who let them in using his key. Defs.' 56.1 Stmt. ¶¶ 48-50. Once inside, Sawchuk and McAuley located 42 handguns and 53 long guns (95 guns in total), which were then transported to the Internal Affairs Division ("IAD") for verification of the serial numbers and safekeeping. *Id.* ¶¶ 50-51. Amato's department-issued firearm was also removed from his locker at the City Jail and secured at the IAD office. *Id.* ¶ 52.

**c. Amato's Transfer to NY Presbyterian Hospital**

Prisoner/arrestees who go through the Yonkers City Jail are regularly transported to St. Joseph's for medical attention. Defs.' 56.1 Stmt. ¶ 54. A nursing supervisor approached Dr. Veselinovic and informed her that for Amato's own safety and to ensure that he did not come into contact with prisoners/arrestees he had dealt with at the prison, it would be better for him to be transferred to another facility. Chaf. Aff. Ex. L at 51.

Amato was originally admitted to St. Joseph's on an "emergency basis," which permits the hospital to "hold" a patient for up to 24 hours. Chaf. Aff. Ex. L at 33-35. However, Amato could not be transferred to another hospital as an "emergency" patient, and his status was therefore changed to "involuntary commitment," which allows a hospital to hold a patient for up to 60 days. Chaf. Aff. Ex. L at 33-35. Dr. Veselinovic signed an Authorization for Transfer form on December 8, 2006, and Amato was admitted to NY Presbyterian Hospital ("NY Presbyterian"). Defs.' 56.1 Stmt. ¶ 57. The records from NY Presbyterian indicate that Amato consistently denied having suicidal ideation or ever stating that he wanted to hurt himself, and

that he told hospital personnel that he and his co-worker "had some sort of 'beef' and that it was a set-up." Chaf. Aff. Ex. N at 12/9/06 14:47 note.

**d. Amato's Release from NY Presbyterian**

Amato was discharged from NY Presbyterian four days later, on December 12, 2006. Chaf Aff. Ex. N. The hospital's discharge notes indicate that as of December 12, Amato had "no signs of clinical depression," that there was "no evidence of psychosis or mood [disorder]," and that Amato agreed to go to counseling "as referred by EAP." *Id.* At the time of his discharge, the hospital medical staff had not yet determined whether Amato was mentally fit to possess or carry any firearms or guns. Defs.' 56.1 Stmt. ¶ 59. As per an undated letter from Dr. Ayodele Adeigbola at NY Presbyterian to Fara:

> Treatment team has determined that Mr. Amato is able to leave the hospital and can return to work. However, the return of his firearms should be contingent upon his compliance with the discharge plan, and his establishment of a relationship with Dr. Raymond Griffin, PhD, who will make a decision about continued safety.

Chaf. Aff. Ex. Q.

A December 12, 2006 memorandum from Fara to Defendant Hartnett ("Hartnett"), the City Police Commissioner, states that Fara was advised by Sheila Cherico, Amato's social worker, that Amato was released from NY Presbyterian "on the condition that he would continue counseling on an out-patient basis and that he can return to work but not be allowed to carry or possess firearms until he is permitted to do so by a psychiatric professional." Chaf. Aff. Ex. R.[4]

On December 28, 2006, Amato was examined by Paul J. Gunser, Psy.D. after being referred by Lt. Cavorti of the Yonkers Police Department Medical Control Unit. Chaf. Aff. Ex.

[4] Plaintiff states that "there is no indication in the hospital record that [his] release was conditioned upon anything whatsoever." Pl.'s 56.1 Stmt. ¶ 64. However, the hospital's records indicate that Amato "agreed to receive counseling upon discharge from the hospital." Chaf. Aff. Ex. N.

S. Dr. Gunser's report concludes that "[t]here is no evidence to suggest that [Amato] should be restricted from weapons possession at this time." *Id.* at 2. In a memorandum from Fara to Deputy Chief Thomas Sullivan, dated January 16, 2007, Fara states, "I respectfully request authorization for D.O. Carl Amato to possess and carry his service weapon *while on duty*. D.O. Amato has been medically cleared by Lt. Cavorti (Medical Control) to possess said weapon. D.O. Amato will sign for his weapon at the beginning and end of his tour." Chaf. Aff. Ex. T (emphasis added). Fara testified that the decision to restrict Amato's use of his firearms to work "wasn't made by [him]," and that it "came out of medical control." Chaf. Aff. Ex. F at 26. Lt. Cavorti testified that he considers the opinion of Dr. Gunser as to whether a peace officer can carry his gun "determinative," and that in the case of Amato, Dr. Gunser "cleared him." Cascione Aff. Ex. 5 at 8. In Cavorti's experience, after an officer has been cleared by Dr. Gunser, the department does not retain the officer's personal firearms as well as their duty firearms. *Id.* at 9. When asked why Amato's firearms were still in police custody, Sawchuk, who had investigated the background and documentation of Amato's guns, testified, "I don't know why." Chaf. Aff. Ex. G at 20; *see also* Defs.' 56.1 Stmt. ¶ 71.

**e. November 2, 2007 Massage Parlor Incident**

In or around June 2007, non-party Sgt. Robert Bock ("Bock") of the Yonkers Police Department began investigating a potentially illegal massage parlor (the "Massage Parlor"). Defs.' 56.1 Stmt. ¶ 91. A Yonkers Police Department Supplementary Report, dated November 3, 2007 and prepared by Bock, states that he entered the Massage Parlor on November 2, 2007 as part of an undercover operation, and was told to sit in the waiting area before his appointment. Chaf. Aff. Ex. V at 1. The report states that Bock observed Amato in the back of the Massage Parlor next to a woman. *Id.* The woman then approached Bock, told him he had to wait for his

appointment outside, escorted him out of the store, and locked the front door behind him. *Id.* Shortly thereafter, Amato exited the Massage Parlor, placed an object into the trunk of his car, and then reentered the store, locking the door behind him. *Id.* Five minutes later, Amato exited the location again, placed an object in his trunk, and returned to the store, again locking the door behind him. *Id.*

Shortly thereafter, Amato exited the location and drove west on Yonkers Avenue before being detained by non-party Officers Detz and Gibson at Bock's direction. *Id.* Amato was then brought back to the Massage Parlor, where he was questioned by Bock. *Id.* Amato was then brought to the Second Precinct where he waited in the civilian seating area, and it was determined that the Yonkers Internal Affairs Unit would be investigating the issue of why Amato was at the Massage Parlor. *Id.*; Defs.' 56.1 Stmt. ¶ 111.

Amato was subsequently taken to the IAD, where he was shown to a waiting area "with the two police officers mulling around." Chaf. Aff. Ex. C at 110; *see also* Defs.' 56.1 Stmt. ¶ 116. The parties agree that Sawchuk agreed not to question Amato until his attorney appeared. Defs.' 56.1 Stmt. ¶ 118. After three hours, Amato's attorney, John Guarneri, Esq., arrived at the IAD. *Id.* ¶ 119. Upon Guaneri's arrival, Amato told him he wasn't feeling well, and Guaneri talked to Sawchuk, who agreed to allow him to take Amato to the hospital. Chaf. Aff. Ex. C at 111-12. Amato was permitted to leave the IAD on his own to seek medical treatment at Lawrence Hospital. Defs.' 56.1 Stmt. ¶ 121. Prior to leaving the IAD, Sawchuk informed Amato that the interview would be scheduled for some time in the upcoming week. *Id.* ¶ 123. Amato testified that he then went to Lawrence Hospital and that he did not return to the IAD that evening. Chaf. Aff. Ex. C at 112.

**f. November 7, 2007 IAD Interview of Amato**

Amato was interviewed at the IAD by McAulley and Sawcuk on November 7, 2007. *See* Chaf. Aff. Ex. Y; Defs.' 56.1 Stmt. ¶ 130. Present at the interview were Amato, Sawchuck, McAuley, Dorothy Ferrara (Teamsters Union, Local 456, Shop Steward), Sam Khalaf (counsel to the Teamsters Union, Local 456), and Anthony Manzo (Teamsters Union, Local 456, Chief Shop Steward). Defs.' 56.1 Stmt. ¶ 131.

On November 5, 2007, Sawchuk had received a call from Defendant Leahy ("Leahy"), Executive Officer of the City Courts and Detention Facilities, inquiring on Amato's behalf as to when the IAD interview would be conducted. Defs.' 56.1 Stmt. ¶ 126. Although Sawchuk told Leahy that he could tell Amato that the interview would be tentatively scheduled for November 7, 2007 at 10:00 am at the IAD office, Chaf. Aff. Ex. X at 4, Amato stated during the November 7 interview that he "was never notified" about the scheduling by Leahy, and that he only learned about the interview that morning at 9:00 am when he arrived at work. Chaf. Aff. Ex. Y at 8-11.

After some back and forth regarding the scheduling of the interview, Sawchuk and McAuley began questioning Amato at approximately 11:00 am. Defs.' 56.1 Stmt. ¶ 130. Amato was presented with a Garrity Warning standard form, which was endorsed by both Amato and Khalaf. *Id.* ¶¶ 132-33. Following the issuance of the Garrity Warnings, McAuley began asking Amato questions about the Massage Parlor incident. *Id.* ¶ 134. When asked if he was satisfied with his legal representative, Amato responded that Khalef was "not [his] representative of choice," that "[his] legal counsel [was] tied up [that day]," and that he would "prefer to have [his] other counsel here." Chaf. Aff. Ex. Y at 5-6. After answering a few questions, Amato stated that he "would just rather not answer the[] questions now," that he "would prefer Mr. Cassione [sic] were [there] for the questions," and that "[i]f [he] had known [the interview] was

[scheduled for] today [he] would have made arrangements for Tommy [Cascione] to be here." *Id.* at 7-8, 13. Amato was then told that he was "being compelled to answer the[] questions . . . at this time," and that if he refused to answer the questions, he would be "subject to disciplinary action, which could include termination." *Id.* at 7-8. Amato was then directly ordered to answer 73 individual questions, which he refused to answer, stating that under counsel's advisement, he could not answer them without him being present. *Id.* ¶¶ 140-41.

**g. Amato's Suspension and Termination and Subsequent Arbitration**

On November 9, 2007, Amato was notified that he was being suspended without pay for, *inter alia*, his failure to answer questions at the November 7, 2007 interview at IAD concerning the Massage Parlor incident. Defs.' 56.1 Stmt. ¶ 142. On November 14, 2007, Amato was issued a "Notice of Discipline" notifying him that he was being terminated and the violations giving rise to his termination, and informing him that he "shall be afforded a reasonable opportunity to have a Union representative present at a disciplinary interview which may lead to the imposition of a disciplinary penalty." Chaf Aff. Ex. BB.

On December 12, 2007, a Disciplinary Review was held before Brian M. Lucyk ("Lucyk"), Commissioner of Human Resources, pursuant to the terms of the collective bargaining agreement between the City and Local 456. Chaf. Aff. Ex. CC. Present at the Disciplinary Review was Amato, Sawchuk (on behalf of the City), and John Henry, Esq., Lou Picani and Ferrara (all of the Teamsters, Local 456). *Id*. On February 11, 2008, Lucyk issued a Disciplinary Review Determination which provides, in part, that "the questioning of Detention Officer Amato concerning his presence at [the Massage Parlor] on November 2, 2007 at approximately 6:00 p.m. was appropriate. His refusal to answer questions was not." *Id.* Lucyk concluded that Amato was guilty of the charges contained in the Notice of Discipline, and that

the penalty of termination was appropriate. *Id.*

On June 17, 2008, in accordance with the provisions of the collective bargaining agreement, an arbitrator heard Amato's appeal of Lucyk's February 11, 2008 Disciplinary Review Determination regarding his termination. Defs.' 56.1 Stmt. ¶ 149. At the arbitration hearing, both parties appeared and were afforded a full opportunity to be heard, offer evidence, testimony, oral argument, and to examine and cross-examine witnesses. *Id.* ¶ 150. The sole issue before the arbitrator was: "Did the City of Yonkers . . . have just cause to dismiss the Grievant, Carl Amato?" *Id.* ¶ 151. The arbitrator ultimately found that the City was justified in terminating Amato due to his "refusal to comply with direct orders to respond [to questioning]." *Id.* ¶ 157.

## II. Legal Standard on Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)) (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

**III. Section 1983 Claims Against the Individual Defendants**

**a. Qualified Immunity**

The individual Defendants have raised the defense of qualified immunity. "A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken." *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (citations, brackets, ellipses, and quotations omitted).

The Second Circuit recently explained that "[q]ualified immunity thus affords government officials breathing room to make reasonable—even if sometimes mistaken—decisions, and protects all but the plainly incompetent or those who knowingly violate the law from liability for damages." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (citations and quotations omitted). Therefore, "[w]hether qualified immunity applies in a particular case generally turns on the objective legal reasonableness of the challenged action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (citations and quotations omitted).

The Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation and quotations omitted). Under a qualified immunity analysis, "[f]irst, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," *id.*, and then "[s]econd, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* The Supreme Court has allowed "district courts . . . to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

**b. Summary Judgment is Warranted on Plaintiff's First Amendment Freedom of Speech Claim**

Plaintiff alleges that his warning to Bennett that Moray was threatening murder and suicide was protected speech under the First Amendment, and that his alleged involuntary commitment, wrongful termination, and the continued seizure of his firearms was directed against him by Defendants in retaliation for his exercise of his constitutional right to free speech.

Compl. ¶¶ 35-36. Where, as here, a public employee brings a First Amendment retaliation claim, the plaintiff must prove that: "(1) they engaged in constitutionally protected speech because they spoke as citizens on a matter of public concern; (2) they suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds*, *Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). Defendants may "escape liability," however, if they can demonstrate that either "(1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.*

Here, even assuming that Plaintiff spoke as a citizen on a matter of public concern when he allegedly conveyed Moray's threats to Bennett, summary judgment is nevertheless appropriate because the Court finds that Plaintiff has failed to establish that his termination was a "motivating factor" in his termination.[5]

[5] Defendants argue that Amato's statements to the Westchester County detectives who were investigating Moray's shooting warrants dismissal of *all* his claims because, according to Defendants, Amato's statements to the detectives conflict with his allegation that he told Bennett that Moray made statements about killings his wife and himself. Defs.' Mem. L. 6. Although the Westchester County Police Department report states that "Amato stated that [] Moray did not indicate to him that he would try to kill his wife or himself," Chaf. Aff. Ex. EE at 18, Amato claims that he was specifically asked whether he knew that Moray was "going to do something *that day*," to which he responded "no," and that he believed that his answer was "technically" accurate at the time. Cascione Aff. Ex. 1 ¶ 7. Amato testified at his deposition that he told Bennett that Moray wanted to kill himself and gave Bennett Moray's gun. Chaf. Aff. Ex. C at 12-13. Bennett, on the other hand, testified that Amato did not come to him with concerns about Moray in the weeks leading up to his death or hand Moray's gun over to him. Chaf. Aff. Ex. E at 19-20. Accordingly, in light of the conflicting evidence regarding what Amato knew prior to Moray's death and whether he reported the information to Bennett, and construing the facts in the light most favorable to Amato, the Court finds that a genuine issue of fact exists, and summary judgment on Amato's constitutional claims on that basis is therefore denied.

**i. Plaintiff's Alleged Protected Speech was not a "Motivating Factor" in his Termination**

To prevail on a First Amendment retaliation claim, a plaintiff must demonstrate a "'causal connection . . . sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action.'" *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 296-97 (E.D.N.Y. 2009) (quoting *Cotarelo v. Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006)). A plaintiff can demonstrate a causal connection "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (citation omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001), and "courts must carefully consider the time lapse in light of the entire record." *Kelly*, 675 F. Supp. 2d at 297 (citing cases). If the plaintiff can satisfy this burden, the defendant must "demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action 'even in the absence of the protected conduct.'" *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994) (citation omitted).

**1. The Only Adverse Employment Action Plaintiff Alleges is his Termination in November 2007**

The parties dispute whether several intervening events between Amato's alleged speech and his termination qualify as "adverse employment actions," including the alleged harassment Amato experienced at the workplace, his alleged involuntary psychiatric commitment and the

seizure of his weapons in December 2006.[6]

The Second Circuit has held that "the proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006)) (internal quotation marks omitted). "Adverse employment actions [typically] include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Gallagher v. Town of Fairfield*, No. 10 Civ. 1270 (CFD), 2011 WL 3563160, at *4 (D. Conn. Aug. 15, 2011) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). The Second Circuit has held that "lesser actions may meet the adversity threshold, but [has] not explicitly defined what quantum of lesser actions constitutes an adverse employment action." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (citations omitted). However, Second Circuit precedent "allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." *Id.* Thus, to prove a First Amendment retaliation claim in a situation other than the classic examples of termination, refusal to hire or promote, demotion, reduction in pay, and reprimand, a plaintiff must show that "(1) using an objective standard; (2) the total circumstances of her

[6] Although Plaintiff also argues that the commitment of Amato and seizure of his weapons was followed by a "series of harsh penalties" and includes examples of such "harsh penalties" in his opposition papers, Plaintiff fails to cite to *any evidence* in the record supporting his contention that such penalties took place, and also fails to include such facts in his response to Defendants' Rule 56.1 Statement. Pl.'s Mem. L. 5-6. Local Rule 56.1(b) provides that "[t]he papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, *and if necessary, additional paragraphs* containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." The Court is not required to search the record for genuine issues of material fact or to "consider what the parties fail to point out" in their 56.1 Statements. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Accordingly, the Court does not consider the examples of "harsh penalties imposed for petty infractions" included in Plaintiff's opposition papers where Plaintiff has failed to cite to any corroborating evidence in the record or include such facts in his 56.1 Statement.

working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Id.* "Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a longer period of time may be actionable if they attain the critical mass of unreasonable inferiority." *Id.*

Here, Plaintiff's hospitalization simply does not relate to his "working environment," nor can it be said that Fara's and Bennett's insistence that Amato go to the hospital in December 2006 resulted in Amato's workplace becoming "unreasonably inferior and adverse." Although Amato was ultimately admitted to the hospital, it was the decision of Amato's doctors, and not of the City or any of its employees, that he should be held on an involuntary basis. Defs.' 56.1 Stmt. ¶ 43; Chaf. Aff. Ex. L at 33-35. Similarly, Plaintiff has failed to show how the seizure of his firearms caused his working environment to be "unreasonably inferior and adverse when compared to a typical or normal . . . workplace." The evidence does not suggest that Amato's work was substantially affected by his inability to carry a firearm.[7]

Finally, Amato claims that the alleged harassment he experienced at work constituted an adverse employment action. Amato testified that after Moray's death, Bennett was "hostile to [him]" and that for a five week period, he "kept [him] at the jail" and "didn't [give him] overtime or anything." Chaf. Aff. Ex. C. at 29. Amato also testified, however, that on any given day, some detention officers would be assigned to transport prisoners from the prison to City Court

[7] Moreover, even assuming the seizure of his firearms constituted an "adverse employment action," the evidence suggests that Amato's doctors, and not the City, made the initial determination that Amato's firearms should be held for safekeeping. Although Amato disputes Fara's testimony that Dr. Veselinoic instructed him to take Amato's guns for safekeeping, he has pointed to no evidence in the record contradicting Fara's testimony. The fact that Dr. Veselinovic's report states that Amato's "[w]eapon in the possession of Yonkers PD supervisor" does not suggest that Dr. Veselinovic never instructed Fara to seize Amato's weapons. Plaintiff had the opportunity to question Dr. Veselinovic on the subject at her deposition, but apparently chose not to.

and back, and that some officers had to stay back at the jail because "they didn't need the extra body on the trip." Chaf. Aff. Ex. C at 26-27. He further stated that being assigned to stay at the jail, where detention officers would be responsible for "[b]ooking, fingerprinting, [and] property," "wasn't a bad job," but that he "like[d] to be out on the road doing transport and going to the County Jail." *Id.* at 25, 28. He testified that Bennett would assign him to stay at the jail "every now and then" prior to Moray's death," but that he was "kept [] at the jail" for five weeks after Moray's death.

Courts in the Second Circuit have held that reductions in workload or inferior or less desirable assignments can constitute adverse employment actions where they impact a plaintiff's opportunity for professional growth and career advancement. *Agard v. New York State Dep't of Taxation & Fin.*, 10 Civ. 4726 (JS) (GRB), 2012 WL 601474, at *7 (E.D.N.Y. Feb. 23, 2012) (citing cases); *see e.g.*, *Mishk v. Destefano*, 5 F. Supp. 2d 194, 202 (S.D.N.Y. 1998) (holding that Plaintiff failed to demonstrate adverse employment action where he failed to produce evidence that the position to which he was transferred was "in any way less desirable, in terms of salary, work schedule, or responsibilities"). Here, however, Plaintiff has failed to produce any evidence "aside from his own personal opinion" that his being assigned to work at the jail was a "less desirable" assignment than transferring prisoners from the jail to the courthouse. *Dillon*, 497 F.3d at 254. The *only* evidence submitted by Plaintiff regarding his assignment to the jail is that he preferred to be "on the road doing transport." Moreover, Plaintiff specifically testified that on any given day, some detention officers were assigned to the jail, while others were assigned to transport prisoners; that is to say that staying at the jail was *part of* Plaintiff's job description. Accordingly, although Plaintiff might have preferred to be "on the road," the Court finds that Plaintiff has failed to show that his assignment to the jail would "chill a person of ordinary

firmness from exercising his free speech rights." *Id.* (citation and quotations omitted). Accordingly, the only adverse employment action Plaintiff has alleged is his termination by the City in November 2007.

**2. Plaintiff's Termination was not Substantially Motivated by his Alleged Protected Speech**

Plaintiff has failed to show that "the protected speech was a substantial motivating factor in the adverse employment action." *Kelly*, 675 F. Supp. 2d at 296. The record clearly demonstrates that Amato's termination was specifically because of his failure to answer questions during the November 7, 2007 IAD interview and his "prior disciplinary history." Defs.' 56.1 Stmt. ¶¶ 142-43. Amato's termination was upheld by a Disciplinary Review before the Commissioner of Human Resources, who determined that "the penalty of termination for failure to answer the Police Department's questions was appropriate." *Id.* ¶ 148. Subsequently, an arbitrator also found that Amato's termination based on his refusal to answer questions after he had been "assured that his constitutional privilege against self-incrimination would be protected" was justified. *Id.* ¶ 157.

There is no evidence in the record of which the Court is aware indicating that Plaintiff's termination, which occurred at least 19 months after his alleged protected speech, was substantially motivated by that alleged speech. Rather, the termination was clearly related to Amato's refusal to answer questions during an IAD interview about an incident totally distinct and unrelated to Moray's death or Amato's alleged protected speech, and it is clear that Defendants "would have undertaken the same adverse employment action 'even in the absence of the protected conduct.'" *Blum*, 18 F.3d at 1010; *see also* Defs.' Mem. L. 10. Accordingly, because Plaintiff has failed to establish that his speech was a "motivating factor" in his

termination, Defendants' motion for summary judgment on Plaintiff's First Amendment claim is GRANTED.

**c. Plaintiff's Due Process and Fourth Amendment Claims Arising from his Hospitalization**

Plaintiff alleges that his due process and Fourth Amendment rights were violated when he was "involuntarily committed to a mental hospital without due cause." Compl. ¶¶ 39, 46.

**i. Material Issues of Fact Exist Regarding Plaintiff's Fourth Amendment Claim Arising from his Alleged Involuntary Commitment**

Defendants argue that summary judgment on Plaintiff's Fourth Amendment claim is appropriate because Fara and Bennett "had the authority under state law to bring Amato [to] the hospital." Defs.' Mem. L. 12. New York Mental Health Law § 9.41 provides that

> [a]ny peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 . . . .

"[L]ikely to result in serious harm" is defined as:

> (a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.

N.Y.M.H.L. § 9.01. If applicable, Section 9.41 would be a privilege that justified Fara's and Bennett's decision to take Amato to the hospital, regardless of whether Amato consented to be taken or not. *Glowczenski v. Taser Int'l Inc.*, No. 04 Civ. 4052 (WDW), 2010 WL 1936200, at *5 (E.D.N.Y. May 13, 2010). In determining whether Defendants are entitled to Section 9.41

privilege, the Court must determine whether they had probable cause to conclude that Amato was acting in a manner that invoked Section 9.41. *Id.* at *6 (citing *Kerman v. City of New York*, 261 F.3d 229 240 n.8 (2d Cir. 2001)). An objective reasonableness standard is applied to police behavior under Section 9.41, as well as to claims under the Fourth Amendment. *Id.* "The relevant probable cause inquiry converges on whether the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant a person of reasonable caution to believe that [he] might be mentally ill and conducting [himself] in a manner likely to result in serious harm to [himself]." *Nicholas v. City of Binghamton*, No. 10 Civ. 1565, 2012 WL 3261409, at *5 (N.D.N.Y. Aug. 8, 2012).

Here, the parties dispute what Plaintiff said prior to his being taken to the hospital and whether he consented to being taken. Although Defendants argue that Plaintiff consented to being taken to the hospital and that his Fourth Amendment claim fails on that basis alone, Defs.' Mem. L. 13, the issue of Amato's consent is in dispute, as Amato claims that he refused, and that he was ultimately forced to go against his will. *Compare* Chaf. Aff. Ex. E at 36; Ex. F at 21 *with* Chaf Aff. Ex. C at 54, 144. Moreover, the Court finds that the issue of whether Fara's and Bennett's belief that Amato posed a "substantial risk of physical harm" to himself or others is a question of fact for the jury. First, while Zippo claims that Amato made a statement indicating that he was contemplating hurting himself, Amato denies ever making any such statement, and the other individuals present for Amato's alleged statement did not hear Amato threaten to harm himself. *See* Chaf. Aff. Ex. K at 1, 3; Ex. C at 50-51. At this stage, the Court must credit Amato's version of the facts. *See Kerman*, 261 F.3d at 241.

Moreover, the record indicates that in addition to the alleged statement described above, Fara and Bennett based their decision to take Amato to the hospital on their impression that

Amato "seemed more visibly depressed around that time than he had"; that his sister's marital problems and the fact that the holidays were coming appeared to be bothering him; and in light of the fact that "Moray's death [was] fresh on everybody's mind." Chaf Aff. Ex. E at 33. A jury could find that Defendants acted outside the bounds of the Fourth Amendment and the qualified immunity standards of objective reasonableness in transporting Amato to the hospital based on their observation that he "seemed more visibly depressed" and his alleged statement that he was considering harming himself, which Amato denied ever making. Given the disputed accounts of what transpired prior to Amato's transfer to the hospital, Defendant's motion for summary judgment on Plaintiff's Fourth Amendment claim relating to his wrongful commitment to a hospital is DENIED. Because the record indicates that the only named Defendants involved in the decision to transport Amato to the hospital were Bennett and Fara,[8] Plaintiff's Fourth Amendment claim on the basis of his alleged involuntary commitment is dismissed against all Defendants other than Bennett and Fara.[9]

**ii. Summary Judgment is Warranted on Amato's Due Process Claim Arising from his Alleged Involuntary Commitment[10]**

The Second Circuit has noted that "[a]n involuntary civil commitment is a 'massive curtailment of liberty,' and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) (quoting *Vitek v.*

[8] The record is not clear regarding who physically *took* Amato to the hospital, however, Fara and Bennett both admit that they were involved in the decision to send him there. *See* Chaf Aff. Ex. C at 54; Ex. E at 35-36; Ex. F at 21-22; Defs.' 56.1 Stmt. ¶ 35.

[9] Zippo informed Bennett and Fara of Amato's alleged suicidal statement, however, the record clearly indicates that Zippo was not involved in the decision to take Amato to the hospital or his subsequent transport to the hospital. Accordingly, Plaintiff's Fourth Amendment claim based on his involuntary transfer to the hospital cannot be maintained against Zippo. *See* Chaf. Aff. Ex. C at 54, 144-45.

[10] Although Plaintiff brings both due process claims under the Fifth Amendment (Second and Third Causes of Action), because the Fifth Amendment only applies to claims against the federal government, the Court assumes that Plaintiff intended to bring his due process claims under the Fourteenth Amendment.

*Jones*, 445 U.S. 480, 491 (1980)). However, Amato's claim that the Defendants violated his procedural due process rights when they transported him to the hospital is without merit. New York Mental Hygiene Law § 9.41 "does not provide any specific procedure or hearing prior to being transported to a hospital or psychiatric emergency program. In other words, according to the New York Mental Hygiene Law, [Amato] was not entitled to any process before being transferred to the [hospital]." *Mawhirt v. Ahmed*, 86 F. Supp. 2d 81, 88 (E.D.N.Y. 2000), *affirmed in relevant part*, 8 F. App'x 125, 127 (2d Cir. 2001) ("The officers also did not violate Mawhirt's procedural due process rights when they transported him to UHSB . . . because he was not entitled to a hearing before being taken to a hospital or psychiatric emergency program."). Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's Second Cause of Action.[11]

**d. Summary Judgment is Warranted on Plaintiff's Due Process Claim Arising from his Termination**

Plaintiff alleges that his constitutional rights were violated because he was "terminated from his employment without due process of law [and] because he invoked his Fifth Amendment right against self-incrimination." Compl. ¶¶ 41-42. For claims alleging procedural due process violations, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Narumanchi v. Bd. of Trustees of Ct. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) (citation omitted). Here, Defendants concede that Plaintiff has a protected property interest in keeping his job. Defs.' Mem. L. 11 n.8. Accordingly, the next issue is "whether the government deprived the plaintiff of that interest without due process. The second

[11] Although Plaintiff alleges only that he was "involuntarily committed to a mental hospital *without due cause*," Compl. ¶ 39, both parties make arguments regarding whether the Defendants' transfer of Amato to the hospital violated his *substantive* due process rights. Even assuming Plaintiff stated a claim for violation of his substantive due process rights, the Court finds that Fara's and Bennett's actions in transferring Amato to the hospital cannot "fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." *Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (citation and quotations omitted) (per curiam).

step of the analysis thus asks what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)). An employee with a property interest in his employment, like Amato, "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before he is subjected to the loss of employment. *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 212 (2d Cir. 2002) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). However, "procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *Id.* (citing *Locurto v. Safir*, 264 F.3d 154, 171 (2d Cir. 2001)).

Here, the record establishes that after being provided with a "Notice of Discipline" on November 14, 2007, notifying Amato that he was being terminated and listing the violations giving rise to his termination, Amato was presented with the opportunity to challenge his termination at the December 12, 2007 Disciplinary Review, which was held pursuant to the terms of the collective bargaining agreement between the City and Amato's union, and at which Amato was present with his union representatives. Subsequently, on June 17, 2008, in accordance with the collective bargaining agreement, an arbitrator heard Amato's appeal of the Disciplinary Review determination. After Amato was afforded a full opportunity to be heard, the arbitrator found that the City was justified in terminating him. Accordingly, the Court finds that Amato was provided with written notice of the charges against him, an explanation of the violations giving rise to his termination, and an opportunity to be heard at the December 12,

2007 Disciplinary Review, and again at the June 17, 2008 arbitration.[12]

**e. Defendant Sawchuk is Entitled to Qualified Immunity on Plaintiff's Fourth Amendment Claim Arising from the Search of his Home and Seizure of his Firearms**

Plaintiff alleges that his Fourth Amendment rights were violated when "his home was searched and his property seized." Compl. ¶ 46. Defendants' sole argument with respect to Plaintiff's claim is that Plaintiff consented to Sawchuk and non-party McAuley entering his home to collect his firearms. Plaintiff, on the other hand, argues that Plaintiff was "coerced by the threat that the officers would break into his home" and ultimately consented to the search "[u]nder duress." Pls.' Mem. L. 11-12.

In the context of a Section 1983 claim asserting an illegal search in violation of the Fourth Amendment, "[t]he relevant question ... is ... whether a reasonable officer could have believed [the] search to be lawful, in light of clearly established law and the information the searching officers possessed." *Washpon v. Parr*, 561 F. Supp. 2d 394, 404 (S.D.N.Y. 2008) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Castro v. United States*, 34 F.3d 106,

[12] Although Plaintiff argues that the "failure to provide Amato with sufficient notice of the IAD interview of November 7, 2007 denied him due process," Pl.'s Mem. L. 10, he fails to cite to any authority, and the Court is aware of none, holding that Amato had a "properly or liberty interest" in having "the attorney of his choosing to represent him" during the IAD questioning. *Narumanchi*, 850 F.2d at 72. Plaintiff has therefore failed to satisfy the threshold issue on a due process claim arising from the alleged lack of sufficient notice Amato received prior to the IAD questioning giving rise to his termination. Moreover, the Court notes that the Complaint specifically alleges that Plaintiff's due process claims arose from his being "*terminated* . . .without due process of law," and not from the circumstances of the November 7, 2007 IAD questioning.

Moreover, Plaintiff alleges that his due process rights were violated when he was "terminated from his employment because he invoked his Fifth Amendment right against self-incrimination" (Compl. ¶ 42), however, he fails to include in his opposition papers *any* argument regarding this allegation, or provide the Court with any case law supporting his contention that his termination was wrongful after he refused to answer any questions after being presented with and signing the Garrity Warnings form. Plaintiff's *only* argument regarding his due process claim arising from his termination is that "[t]he failure to provide Amato with sufficient notice of the IAD interview of November 7, 2007, denied him due process." Pls.' Mem. L. 10. Accordingly, Defendant's motion for summary judgment on Plaintiff's due process claim arising from his termination (i.e., Third Cause of Action) is also granted with respect to Plaintiff's allegation that he was terminated because he invoked his Fifth Amendment right to self-incrimination.

112 (2d Cir. 1994) ("Officials are entitled to qualified immunity when their decision was reasonable, even if mistaken."); *accord Butz v. Economou*, 438 U.S. 478, 507 (1978) (stating that federal officials are shielded by qualified immunity from mere mistakes in judgment regardless of whether the mistake is one of fact or law)).

Where a party challenges a consent to a search, the government bears the burden of proof. *United States v. Ramirez*, 115 F. Supp. 2d 401, 407 (S.D.N.Y. 2000) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). A search is lawful where (1) a party gave permission to conduct the search and had the requisite authority to consent to the full scope of the search conducted, and (2) given the totality of the surrounding circumstances, the consent was voluntary. *Id.* (citations omitted). In ascertaining whether a consent to search is voluntary, the court looks to the "totality of all the circumstances" to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Id.* at 409 (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Phillips v. Cnty. of Orange*, 10 Civ. 239 (KMK), 2012 WL 4108113, at *16 (S.D.N.Y. Sept. 11, 2012) (quoting *Shneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). As long as the consent is not coerced, it is valid, and "[t]herefore, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness." *Id.* (citation omitted).

Here, Sawchuk testified that Amato was "originally hesitant," but that he ultimately agreed to allow him and McAuley to enter his home after they explained to him that it was for his "own personal safety and well-being." Chaf. Aff. Ex. G at 8. Amato, on the other hand, testified that he gave Defendants approval to enter his house and take his firearms, but only after

they told him they were "going in and getting [his] guns, one way or the other." Chaf Aff. Ex. C at 150-51. However, at other times during his deposition, in describing his conversation with Sawchuk and McAuley, he did not indicate any coercion or threats on their part, and testified only that Sawchuk and McCauley "stated they wanted to get [his] firearms . . . because [he] was going for psychiatric evaluation." *Id.* at 68. Amato asked that they wait until his psychiatric evaluation was completed, to which they responded "that's their procedure." *Id.* Amato's "sister [] was nervous and scared. [He] was getting angry. [He] saw where this was going and [his sister] said, 'Look, just go along with it. We both know that you are fine. This will be over with.' And, you know, so I just said, 'Go get my guns.'" *Id.* at 68-70. Moreover, Amato testified that he subsequently had his brother-in-law meet Defendants at his home in order to let them into the house to conduct their search. *Id.* at 70. Accordingly, in light of Amato's ultimate agreement to allow the officers to enter his home and his subsequent arrangement to have his brother-in-law meet them at his house in order to let them in, the Court finds that a "reasonable officer could have believed [the] search to be lawful." *Washpon*, 561 F. Supp. 2d at 404.[13] Accordingly, Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim arising from the search of his home is GRANTED.

**f. Summary Judgment is Warranted on Plaintiff's Fourth Amendment Claim Arising from his Alleged Arrest**

Plaintiff alleges that Defendants violated his Fourth Amendment rights when they "arrested and detained [him]" on November 2, 2007, "although [he was] innocent and uncharged." Compl. ¶ 48. As Defendants note, the record establishes that the only named individual Defendant who was present at any of the events of November 2, 2007 is Defendant

[13] Although Plaintiff argues that he only consented to the *search* of his home, and not the *seizure* of his guns, Pl.'s Mem. L. 11-12, Plaintiff's deposition testimony contradicts that argument. Amato clearly testified that the officers "stated they wanted to get [his] firearms."

Sawchuk. *See* Chaf Aff. Ex. V. Accordingly, because Plaintiff has dismissed his § 1983 claims against the City, the Court only addresses Plaintiff's Fourth Amendment claim as it relates to Defendant Sawchuk's involvement in the events of November 2, 2007.

According to Amato's own deposition testimony, Sawchuk had no involvement on the day of Amato's alleged arrest until Amato was transferred to the IAD. Chaf. Aff. Ex. C at 109-112. It is undisputed that while Amato was waiting at the IAD, Sawchuk agreed not to question him until his attorney arrived. Defs.' 56.1 Stmt. ¶ 118. Moreover, according to Amato, Sawchuk agreed to allow him to go to the hospital after being informed by Amato's attorney that he wasn't feeling well, stating that "[w]e can question him any time." Chaf. Aff. Ex. C at 111-12. Amato then went to Lawrence Hospital and did not return to the IAD that evening. *Id*. The record establishes that Sawchuk was simply not involved in the detention of Amato or in transporting him to the Second Precinct or to the IAD. *See* Chaf. Aff. Ex. X at 3 (noting that Amato was transported to IAD by Officers Detz and Gibson). Rather, Sawchuk's only involvement, according to Amato's own testimony, was his agreement not to question Amato without his attorney present and to allow Amato to *leave* the IAD on his own. Accordingly, because it is undisputed that Sawchuk had no involvement in any "seizure" of Amato, and because he is the only named Defendant who had any role in the events of November 2, 2007, Defendants' motion for summary judgment on Plaintiff's Fourth Amendment claim arising from his alleged unlawful arrest is GRANTED.

**g. Summary Judgment is Warranted on Plaintiff's § 1983 Conspiracy Claim**

To state a § 1983 conspiracy claim, a plaintiff must allege facts showing: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that

goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (same). Thus, a plaintiff must show that "defendants 'acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated [his] rights, privileges or immunities secured by the Constitution or federal courts.'" *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 507-08 (S.D.N.Y. 2008) (citation omitted). However, because conspiracies are "by their very nature secretive operations, [they] may have to be proven by circumstantial, rather than direct, evidence." *Id.* at 508 (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).

Plaintiff alleges that the "Moray affair was well publicized and notorious" in the City "such that each named individual defendant was well aware of the facts and circumstances." Compl. ¶ 55. Plaintiff further alleges that the actions taken against him "were accomplished by a conspiracy to deprive him of his constitutional rights, to force him out of his job and to protect [the City], such that each named individual defendant should be equally responsible for the wrongful conduct of the others." *Id.* ¶ 56. However, Plaintiff has proffered no evidence to support his contention that there was an agreement or "meeting of the minds" between the individual Defendants to violate his constitutional rights. Although Plaintiff argues in his opposition papers that Defendants Bennett and Fara "presented a false suicidal statement to the hospital staff to cause plaintiff to be held on a contrived commitment," and that Defendants "Bennett, Fara, Sawchuk and Leahy conspired to make false and exaggerated disciplinary complaints to achieve plaintiff's termination," such conclusory assertions of a conspiratorial agreement cannot withstand summary judgment. Plaintiff has not included any allegations or competent evidence to show that the individual Defendants "acted in a willful manner, culminating in an agreement" that violated his rights secured by the Constitution, and

Defendants' motion for summary judgment on Plaintiff's § 1983 conspiracy claim is therefore GRANTED.

**IV. Issues of Material Fact Exist Regarding Plaintiff's State Law Claim for Conversion**

Defendants argue that summary judgment on Plaintiff's conversion claim is appropriate because he does not have a "right" to his firearms since he has been "committed to a mental institution," which under the Federal Gun Control Act, makes his possession of a firearm "unlawful." Defs.' Mem. L. 24.[14] Defendants cite to *United States v. Waters*, 23 F.3d 29 (2d Cir. 1994), in support of the argument that "[p]eople who have been sent involuntarily to a mental hospital are considered 'committed' for purposes of the Federal Gun Control Act." Defs.' Mem. L. 24. *Waters* held, however, that an individual committed to "St. Lawrence *Psychiatric Center*" under New York Mental Health Law *§ 9.27* was "committed" to a mental institution for purposes of the Federal Gun Control Act. *Id.* at 35-36.

Here, however, Defendants' 56.1 Statement clearly states that Dr. Veselinovic executed a "Certificate of Examination by Director of Community Services or Designee" pursuant to *Section 9.37* of the Mental Hygiene Law, not Section 9.27. Defs.' 56.1 Stmt. ¶ 43. Moreover, Defendants do not point to any evidence suggesting that any of the hospitals Plaintiff was admitted to are "mental institutions," as that term is used in the Federal Gun Control Act. Accordingly, the Court finds that summary judgment on Plaintiff's conversion claim is not appropriate in light of the disputed facts regarding whether his admission to the hospital constituted "commit[ment] to a mental institution" for purposes of the Federal Gun Control Act.

[14] In his opposition papers, Plaintiff asks the Court to grant summary judgment in his favor on his conversion claim, however, the Court does not consider Plaintiff's request because he was never granted leave to make such a motion by the Court. *See* July 13, 2010 Minute Entry.

## V. Conclusion

For the reasons set forth above, Defendants' motion is GRANTED with respect to Plaintiff's: First Amendment claim (First Cause of Action); Due Process claims arising from Plaintiff's involuntary commitment and termination (Second and Third Causes of Action); Fourth Amendment claims relating to the search and seizure of Plaintiff's property and alleged arrest (Fifth and Sixth Causes of Action); and Section 1983 conspiracy claim (Ninth Cause of Action), and DENIED with respect to Plaintiff's Fourth Amendment claim arising from his alleged involuntary commitment (Fifth Cause of Action); Second Amendment claim (Fourth Cause of Action); and conversion claim (Eighth Cause of Action). Accordingly, the only claims that remain in this case are Plaintiff's Fourth Amendment claim arising from his involuntary commitment as against Bennett and Fara, Second Amendment claim, and conversion claim. The Clerk of the Court is respectfully directed to terminate the motion. Doc. 34.

The parties are to appear for a pre-trial conference on May 2, 2013, at 11 a.m.

It is SO ORDERED.

Dated: March 30, 2013
White Plains, New York

Edgardo Ramos, U.S.D.J.